FRANCISCO PÉREZ SÁNCHEZ ET AL., demandantes y recurrentes, *v.* ADVISORS MORTGAGE INVESTORS, INC., demandada y recurrida.

*Número:* RE-86-584 *Resuelto:* 3 de junio de 1992

532

*Héctor M. Collazo*, abogado de los recurrentes; *Carlos R. Ríos Gautier*, abogado de la recurrida.

LA JUEZ ASOCIADA SEÑORA NAVEIRA DE RODÓN emitió la opinión del Tribunal.

Los esposos Francisco Pérez Sánchez y Petra Marcano (en adelante los esposos Pérez Marcano) y otros, solicitaron préstamos hipotecarios a la financiera Advisors Mortgage Investors, Inc. (en adelante Advisors). Tales préstamos fueron concedidos y, como parte de las transacciones, se acordó que Advisors retendría parte del dinero con el fin de cancelar las hipotecas que gravaban las propiedades de los esposos Pérez Marcano y los demás solicitantes.

Al mismo tiempo, Pioneer National Title Insurance Company (en adelante Pioneer), a través de Apex Title Insurance Agency, Inc. (en adelante Apex) expidió unas pólizas de seguro de título y varios resguardos provisionales en algunos de los casos. Tanto las pólizas de seguro de título como los resguardos provisionales se emitieron a favor de Advisors y/o sus cesionarios.

Advisors no cumplió con el compromiso de cancelar la primera hipoteca que gravaba la propiedad de los esposos Pérez Marcano ni la de las otras personas con las que también se había acordado lo mismo. Por tal razón, los esposos Pérez Marcano se encontraron pagando dos (2) hipotecas en vez de una sola. En cuanto a dos (2) de los demandados, los señores Pérez Sánchez y Serafín Mojica Arroyo, Pioneer pagó y canceló el gravamen que surgía del registro de la propiedad. Ello se debió a que Advisors negoció los pagarés, los cuales fueron adquiridos por un tercero de buena fe. Frente a los endosatarios de buena fe de los pagarés garantizados por hipoteca, la aseguradora no tenía defensas que oponer.

Ante tal situación, los esposos Pérez Marcano, en unión a los otros perjudicados, radicaron demanda en daños y perjuicios(¹) en el Tribunal Superior, Sala de San Juan, en contra de Advisors, Pioneer y Apex.(²)

---

(¹) Aparecen también como demandantes las personas siguientes: Edelmira Burgos, José A. Miranda Escudero y la sociedad de gananciales compuesta por él y su esposa, Juan Castro, Mario González, por sí y en representación de la sociedad de gananciales compuesta por él y su esposa Irma Orellano de González, Zenen Ortiz Morales, por sí y en representación de la sociedad de gananciales compuesta por él y su esposa Esther Orellano de Ortiz, Justo Lanzo Llanos y su esposa Ramonita Cesarfo, Isla Home Sales & Investment Co. y Edwin Santiago Guzmán, Serafín Mojica Arroyo y su esposa Carmen Rivera de Mojica, Alejandrina Ramos y su esposo Miguel Pabón, Ismael Rodríguez y su esposa Milagros Ramos, Ana Virginia Quintana Velázquez, Juan Rivera de Jesús y su esposa Angélica Pérez, René Santiago Rosado y su esposa María M. González Madera, Gilberto Rosado y Luis Velázquez Ocasio, José Negrón y Carmen Nydia Otero, José R. Estrella Rohena y Nydia Otero García, María M. González, viuda de Santiago y Rafael Rodríguez.

(²) Fueron también incluidos como demandados Consolidated Mortgage and Finance Corp., Raúl V. Mena, Jorge García, José L. Basora Gil, José L. Basora Benítez, Directores, Oficiales de Advisors Mortgage Investors Inc., Accionistas, Oficiales y

■ Así las cosas, tanto Pioneer como Apex presentaron cada una por separado una moción de desestimación y/o sentencia sumaria. En ambas mociones se alegó que tanto en las pólizas como en los *binders*([3]) surge que los demandados no realizaron contrato alguno con los demandantes. Se alegó, además, que la responsabilidad de Pioneer y Apex es para con los asegurados, quienes no son los demandantes. Se concluyó, por lo tanto, que los demandantes no tienen *standing* para reclamarle a los demandados.

Los demandantes, por su parte, se opusieron a la moción de Pioneer y a la de Apex. El tribunal de instancia acogió la moción de sentencia sumaria y dictó sentencia parcial, desestimando la demanda en cuanto a las codemandadas Pioneer y Apex. Basó su determinación en que no existía controversia sustancial sobre ningún hecho material y que, como cuestión de derecho, procedía conceder la desestimación de la demanda.

Inconformes con esta determinación, los esposos Pérez Marcano y los demás reclamantes presentaron escrito de revisión ante nos, alegando como único error el siguiente:

> Erró el honorable Tribunal Superior, Sala de San Juan, al desestimar la demanda contra la Codemandada PIONEER TITLE INSURANCE y APEX TITLE INSURANCE AGENCY INC. habiendo una controversia real y sustancial entre las partes que requiere ser resuelta en un juicio plenario.

Decidimos revisar y expedimos el auto.

---

Junta de Directores de Advisors, Richard Doe y John Doe, Juan, en representación de cualquier compañía, corporación o sociedad que les puedan responder a los demandantes, y a Pedro como cualquier individuo que pueda ser responsable a los demandantes en el presente caso.

([3]) Un *binder* es "[un] convenio provisional que cubre el asegurado si le ocurre pérdida antes de que la póliza sea oficialmente expedida". I. Rivera García, *Diccionario de Términos Jurídicos*, Equity Publishing Corp., New Hampshire, 1976, pág. 320.

## II

La parte demandante argumenta en su escrito de revisión que de la ley, la póliza expedida y las circunstancias especiales que rodean el presente caso surge la legitimación activa o capacidad de los demandantes para instar la presente acción en contra de las compañías de seguro. Se ampara en el Art. 20.030 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 2003, el cual dispone que:

> (1) La persona que sufriere los daños y perjuicios tendrá, a su opción, una acción directa contra el asegurador conforme a los términos y limitaciones de la póliza, acción que podrá ejercitar contra el asegurador solamente o contra éste y el asegurado conjuntamente. La acción directa contra el asegurador se podrá ejercer solamente en Puerto Rico. La responsabilidad del asegurador no excederá de aquella dispuesta en la póliza, y el tribunal deberá determinar no solamente la responsabilidad del asegurador, si que también la cuantía de la pérdida. Cualquier acción incoada conforme a esta sección estará sujeta a las condiciones de la póliza o contrato y a las defensas que pudieran alegarse por el asegurador en acción directa instada por el asegurado.
> (2) Si el perjudicado entablara demanda contra el asegurado solamente, no se estimará por ello que se le prive, subrogándose en los derechos del asegurado con arreglo a la póliza, del derecho de sostener acción contra el asegurador y cobrarle luego de obtener sentencia firme contra el asegurado.

Añade, además, que la compañía que expide una póliza de seguro de título tiene la responsabilidad de hacer un estudio registral antes de emitir la póliza. En el caso ante nos, alega la parte demandante que la Pioneer expidió una póliza en la que garantizaba que no había un gravamen hipotecario preferente al asegurado. También se hizo constar que la compañía aseguradora tenía la obligación de representar a Advisor en litigios que surgieran como consecuencia de dicha póliza. En esto se apoya la parte demandante para afirmar que la obligación de la compañía de representar a Advisor implica que se contempló en la

póliza acciones como la de los demandantes en el presente caso, y la responsabilidad de la compañía de seguro ante éstos.

Por otra parte, señalan los demandantes que de no traerse al pleito a la compañía de seguro se corren el riesgo de que los asegurados tampoco lo hagan y, a consecuencia de ello, se queden sin remedio adecuado. Ello por razón de que Advisors dejó de hacer negocios y no tiene oficina. No les asiste la razón. Veamos.

## III

En primer lugar debemos señalar que el Art. 20.030 del Código de Seguros de Puerto Rico, *supra*, es de aplicación en aquellos casos en que se ha expedido una póliza contra accidentes. En el caso de autos no se gestionó un seguro contra accidentes y sí un seguro de título. Se hace imprescindible, entonces, que definamos lo que se entiende por seguro de título. Appleman, un reconocido tratadista en el área de seguros, explica lo siguiente:

> Title insurance policies have been written in this country since about the middle of the 19th century. They have been defined as contracts whereby the insurer, for a valuable consideration, agrees to indemnify the insured in a specified amount against loss through defects of title to, or liens or incumbrances upon realty in which the insured has an interest as purchaser or otherwise. Or, as a New York court has expressed it, a policy of title insurance is the opinion of the insurer concerning the validity of the title, backed by an agreement to make that opinion good if it should prove to be mistaken and a loss should result in consequence. A policy of title insurance has been held to be essentially and solely a contract of indemnity, although it also has been termed a contract of warranty or guaranty. (Escolios omitidos.) 9 *Appleman, Insurance Law and Practice* Sec. 5201, págs. 2–3 (1981).

Como podemos apreciar, la figura del seguro de título que se utiliza en Puerto Rico proviene de Estados

Unidos. Con ésta se persigue fundamentalmente el que el título se pueda mercadear. Esto se refiere a "la necesidad de que el título que es objeto del acuerdo causal se ofrezca libre de circunstancias que puedan generar dudas legales, o simplemente fácticas, acerca de su idoneidad para provocar la transferencia, sin problemas para el adquirente. Acreditar que el título es adecuado, en suma, entendiendo por título ... 'un antecedente susceptible de transferir el dominio'". E. Vázquez Bote, *El denominado seguro de títulos—Ventajas e inconvenientes de su adopción en el derecho español*, XCII Rev. Der. Not. 221, 239 (1976).

La necesidad del seguro de título en Estados Unidos surgió del hecho de que en la sociedad norteamericana no existe archivo inmobiliario alguno. A diferencia de Puerto Rico, allá no existe un registro de la propiedad que acredite que el título carece de riesgos. Señala Vázquez Bote, *supra*, que:

"... el método más común de registro de títulos en los Estados Unidos es el registro de todos los documentos que afecten al título a la propiedad inmueble. Así, la escritura de traspaso (deeds), las hipotecas, las anotaciones de cargas, las sentencias, los procedimientos de adveración (probate) de testamento, las ventas forzosas en cobro de impuestos, los procedimientos hipotecarios y muchos tipos de instrumentos y procedimientos legales, son simplemente copiados en la Casa de los Tribunales (Court House) del condado. No hay ningún funcionario u organismo que tenga el deber de calificar el estado de la titulación de una parcela inmobiliaria en particular y de conservarla al día." (Énfasis suprimido.)

No hay lugar a dudas de que en Estados Unidos se impone la investigación del título y la existencia del seguro de título. En Puerto Rico, a pesar de que algunos sostienen que no se justifica en nuestro Derecho el seguro de título, hay quienes aseguran firmemente que el mismo es beneficioso. Por ejemplo, se afirma que la protección que ofrece dicho seguro no se limita al Registro de la Propie-

dad, sino que va más allá, como el proveer indemnización por las deudas contributivas sobre la propiedad que no surjan del Registro por no estar embargada la finca. En otras palabras, el seguro de título le brinda cierta tranquilidad al asegurado por errores o inadvertencias en el estudio de título. Recordemos que el seguro de título "proporciona cobertura al asegurado contra el riesgo de que, 'después de la adquisición', se descubra que en el título del enajenante 'ya existía', en el momento de contratar el seguro, un defecto que podía privar de su derecho al adquirente. No se trata, por tanto, en el verdadero seguro de título, de cubrir el riesgo de que en un momento futuro pueda sobrevenir un hecho nuevo que afecte el derecho del asegurado. El riesgo asegurado dimana de un defecto oculto en el derecho del enajenante, que el sistema de 'record' no permite descubrir". J. Puig Brutau, *El seguro a favor del adquirente de bienes inmuebles en los Estados Unidos*, XCIII–XCIV Rev. Der. Not. 254 (1976).

En el pasado, en Puerto Rico se suscitó una polémica en torno a los seguros de título. J.E. Fernández Seín, *Las pólizas de seguro de título o de la propiedad en Puerto Rico: ¿Son realmente necesarias?*, Tesis, Facultad de Derecho, U.P.R., 1966, pág. 2. La preocupación por este asunto se planteó en la Comisión de Vivienda y Fomento Cooperativo del Senado de Puerto Rico, en vista celebrada el 1ro de septiembre de 1965. En ese entonces el Sr. Ramón Moreno, Jefe de Operaciones de la Administración de Vivienda Federal (F.H.A.) en Puerto Rico, expresó que:

No es que en Puerto Rico fuera una necesidad el Title Insurance para transacciones dentro de Puerto Rico, *porque existe el Registro de la Propiedad, que la información que expide sería suficiente* (subrayado nuestro) ahora, los compradores de hipotecas requieren un Title Policy, un seguro de título, porque generalmente ésos [sic] compradores son de Estados Unidos, y como allá es distinto al sistema nuestro del Registro de la Propiedad, y, naturalmente, estas instituciones para poder vender esas hipotecas, tienen wue [sic] proveerles un seguro de título,

y para asegurar el título, tiene que haber la investigación de ese título, el Title Search, es una necesidad de mercado.

■■■ El Art. 4.100 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 410, define el seguro de título como "el seguro de dueños de propiedad inmueble u otros que tengan interés o gravámenes o cargas sobre la misma, contra pérdida por gravamen, títulos defectuosos o invalidez o reclamación adversa al título, y los servicios correspondientes". De esta definición se desprende que existe más de una modalidad del seguro de título. Una de ellas es el seguro de dueño o el contrato de seguro con póliza de propietario, el cual se utiliza "para cubrir riesgos en los negocios de transmisión de un 'interés' inmobiliario. Abarca, pues, todo aquello que en nuestro medio y en nuestro Derecho significa la constitución y transmisión de un derecho de carácter real, exclusión hecha de la hipoteca en garantía, y otros derechos reales inmobiliarios con igual función (refacción, etc.) que se incluyen en la modalidad de *loan policy*". Vázquez Bote, *supra*, pág. 287. El seguro de dueño también es denominado seguro de dominio.

■■■ Otra de las modalidades del seguro de título es el seguro de hipoteca, el cual indemniza al asegurado en caso de pérdida de la prioridad registral de la hipoteca.[4] Esta clase de seguro no protege al dueño de la propiedad, sino al acreedor hipotecario. Así lo indica J.M. Pedowitz, *Title Insurance and You: What Every Lawyer Should Know!*, ABA Press, (1979), págs. 4–5:

> At the outset, the attorney must ascertain that his client, the purchaser, is receiving an owner's policy of title insurance. In some parts of the country, it is customary for the purchaser to "rely" upon the title insurance company's willingness to issue a mortgagee a title insurance policy. It cannot be overemphasized that the lender's policy provides no protection to the pur-

---

[4] Véase *Ferrell v. Inter-County Title Guaranty & Mtg. Co.*, 213 So. 2d 518 (1968).

chaser /borrower, even when it is the latter who pays for the policy. While a lender's title insurance policy relates both to the lien of the mortgage and to the quality of the landowner's title, it does not do so for the benefit of the landowner. It is possible, moreover, that the quality of the landowner's title which might be acceptable to a lender would not be acceptable to the landowner, although this possibility becomes remote when the amount of the loan constitutes a high percentage of the total value of the land. Therefore, it is both unsafe and unwise for the purchaser or his attorney to assume that the title insurance company is willing to issue a policy to the owner which contains only those exceptions and exclusions appearing in a lender's policy.

■ En resumen, las pólizas de seguro de título se expiden por una compañía aseguradora a favor del dueño de una propiedad inmueble o sus acreedores hipotecarios. En el caso del dueño de la propiedad, estas pólizas se usan para garantizarle a éste su título e indemnizarle en caso de que dicho titular sufriera una pérdida o menoscabo en su derecho. Estas son las denominadas "Home Owner's Policy".

■ Ahora bien, las pólizas que se expiden a favor de un acreedor hipotecario son las conocidas como "Mortgagee Policies", las que garantizan a éste o a su cesionario "el derecho real de hipoteca que tenga sobre la propiedad inmueble hipotecada, consistiendo dicha garantía en una indemnización por el balance de la deuda garantizada por la hipoteca en caso de que surja algún defecto en el título de la propiedad el cual afectará la validez de dicha garantía hipotecaria". Fernández Seín, *supra*.

■ En Puerto Rico la modalidad de seguro de título que ha predominado es la de hipoteca. M.M. Oronoz Rodríguez, en *El uso del seguro sobre el título en Puerto Rico*, Tesis, Facultad de Derecho, U.P.R., 1965, pág. 2, comenta:

La compraventa de hogares se realiza en la gran mayoría de los casos por medio de empresas de financiamiento que compran las hipotecas aseguradas por la Federal Housing

Authority. Hay una serie de corporaciones, como Housing Investment Corporation y James T. Barnes Inc., que compran las hipotecas aseguradas por la F.H.A. para luego vendérselas a inversionistas continentales. Estos inversionistas quieren que su dinero goce de toda la protección posible. Sin embargo, cuando un deudor hipotecario deja de pagar por su préstamo, la F.H.A. le paga el monto total de la hipoteca al inversionista, solo [sic] si éste le entrega una casa con un título limpio. Si no existe un título limpio el inversionista no puede recobrar de la F.H.A. Como protección contra esta situación los inversionistas requieren el seguro sobre el título. *O sea, el adquirente de la casa tiene que comprar un seguro para que en caso de que el título que esa persona ha adquirido esté viciado, el dinero que el inversionista le prestó para la adquisición de ese hogar esté garantizado. El deudor hipotecario paga por un seguro que solo* [sic] *protege al acreedor hipotecario.* (Énfasis suplido.)

 Cabe señalar, además, que al evaluar reclamaciones como la del presente caso, hay que tomar en consideración no sólo si el reclamante es el asegurado, sino también si la aseguradora tiene la misma obligación para con el reclamante que tiene con respecto al asegurado. No podemos olvidar que la póliza cubre solamente al asegurado. Por tal razón se ha señalado que:

Generally, a title policy insures only the named insured and those who succeed him in interest by operation of law; title policies do not run with the land. Pedowitz, *op. cit.*, págs. 70–71.

 Por otra parte, en el caso de autos también se emitieron unos resguardos provisionales a nombre de Advisors. El Art. 11.210 del Código de Seguros de Puerto Rico, 26 L.P.R.A. sec. 1121, define resguardo provisional, en lo pertinente, de la manera siguiente:

(1) El resguardo provisional se utiliza para hacer obligatorio el seguro temporalmente, pendiente de expedición de la póliza. Podrá ser oral o escrito. Ningún resguardo provisional será válido después de la fecha adquirida en relación al mismo después de la expedición de la póliza por la cual se dio, o después de

haber transcurrido un período razonable que se establecerá mediante reglas y reglamentos que promulgará el Comisionado.

(2) Un resguardo provisional incluirá todos los términos usuales de la póliza en relación con la cual se emita dicho resguardo.([5])

■ En el caso ante nuestra consideración, con relación a la mayor parte de los demandantes, en los resguardos provisionales que se emitieron claramente se indicó que debían cancelarse las hipotecas previas que gravaban las propiedades de los reclamantes para que se procediera a expedir las pólizas de seguro. Como no se cumplió con dicha condición, las pólizas de seguro nunca se expidieron. Con respecto a otros demandantes, se excluyó de la cubierta del seguro los gravámenes anteriores que pesaban sobre la propiedad, así se indica en el "Schedule B" del resguardo provisional. Esto significa que "the exceptions in Schedule B does not constitute affirmative insurance and may in fact be misplaced entirely". Pedowitz, *op. cit.*, pág. 52. Además, en el tiempo en que estuvieron vigentes los resguardos provisionales, éstos protegían únicamente a la financiera Advisors, quien era la asegurada. De manera que siendo el seguro de título un contrato de indemnización, éste se rige por las reglas generalmente aplicables a los contratos de seguro. 13A *Couch on Insurance 2d (Ed. rev.)* Sec. 48:111 (1982).

■ A tales efectos, el Art. 1209 del Código Civil, 31 L.P.R.A. sec. 3374, dispone que los contratos sólo producen efecto entre las partes contratantes y sus herederos. " 'Las

---

([5]) Un resguardo provisional es un *binder.* En 12A *Appleman, Insurance Law and Practice* Sec. 7227, págs. 149–151 y 154 (1981), se dice que:

"The issuance of a binder evidences a complete, temporary, or preliminary contract of insurance effective from that time until issuance of the formal policy or until rejection of the risk, irrespective of the type of insurance concerned.

. . . . . . . . .

"Conversely, a binder does not constitute a part of an insurance policy, nor does it create any rights for the insured other than during its effective period." (Escolios omitidos.)

acciones "ex-contractu" ... sólo pueden ser ejercitadas por una parte contratante en contra de la otra'. La regla general es que en relación con un tercero un contrato es irrelevante; ya que éste simplemente regula las relaciones entre las partes contratantes y al tercero ni siquiera le afecta." (Cita omitida.) *Dennis, Metro Invs. v. City Fed. Savs.*, 121 D.P.R. 197, 211 (1988). Tomando en consideración este principio estatutario, veámoslo aplicado a la situación de hechos del caso de autos.

La aseguradora Pioneer expidió *una póliza de seguro de título de hipoteca y* varios resguardos provisionales a nombre de Advisors. Ésta gestionó dicha póliza con el fin de asegurar su acreencia hipotecaria, puesto que había concedido un préstamo a los esposos Pérez Marcano. Advisor acordó con los esposos Pérez Marcano cancelar la primera hipoteca que gravaba la propiedad de los demandantes, sin embargo, no cumplió con dicha obligación. Por tal razón, los esposos Pérez Marcano instaron demanda en daños y perjuicios contra Advisors y Pioneer, entre otros, que hoy nos ocupa. Pioneer, a su vez, presentó moción de desestimación y/o sentencia sumaria, alegando que el contrato de seguro negociado fue entre Pioneer y Advisors. Esta última es el asegurado. De manera que no existe vínculo contractual alguno entre Pioneer y los demandantes. Así lo señaló el tribunal de instancia cuando en la sentencia parcial afirmó que "[l]os demandantes no eran parte en el contrato de seguros entre Pioneer y Advisors o sus cesionarios, ni dicha póliza contiene disposición alguna a su favor. No pueden[, ] por lo tanto[, ] reclamar bajo la misma". En derecho procedía la desestimación solicitada por Pioneer y Apex. Pasemos ahora a analizar si el vehículo procesal utilizado fue el correcto.

La Regla 36.2 de Procedimiento Civil, 32 L.P.R.A. Ap. III, dispone que "[u]na parte contra la cual se haya formulado una demanda, reconvención o demanda contra

coparte, demanda contra tercero, o contra la cual se solicite una sentencia declaratoria podrá, en cualquier momento, presentar una moción basada o no en declaraciones juradas para que se dicte sentencia sumariamente a su favor sobre la totalidad o cualquier parte de la reclamación". Esta regla permite aligerar los procedimientos y contribuye a la economía procesal. Sin embargo, esto no quiere decir que deba aplicarse a la ligera.

 Por tal razón, en *Consejo Tit. C. Parkside v. MGIC Fin. Corp.* 128 D.P.R. 538, 549 (1991), reiteramos que " '[l]a sentencia sumaria es un remedio extraordinario que sólo debe concederse cuando el derecho del oponente surge con claridad y cuando el promovente ha tenido una oportunidad adecuada de demostrar que el oponente no tiene derecho a que se dicte sentencia en su favor como cuestión de derecho' ". Véanse: *Villanueva v. Hernández Class*, 128 D.P.R. 618 (1991); *Mercado Vega v. U.P.R.*, 128 D.P.R. 273 (1991); *Nassar Rizek v. Hernández*, 123 D.P.R. 360 (1989); *M.J.C.A., menor v. J.L.E.M., menor*, 124 D.P.R. 910 (1989); *Corp. Presiding Bishop CJC of LDS v. Purcell*, 117 D.P.R. 714, 720 (1986).

Examinado el expediente y los documentos que obran en el mismo, no cabe la menor duda de que el tribunal tuvo ante sí todos los hechos necesarios para dictar sentencia sumaria parcial, desestimando la reclamación contra Pioneer y Apex. Tanto la póliza de seguro de hipoteca como los resguardos provisionales se emitieron a favor de Advisors y sus cesionarios. Estas pólizas no protegían a los demandantes compradores. Como cuestión de hecho, no existe vínculo contractual alguno entre los demandantes y Pioneer.[6] De manera que no habiendo la parte deman-

---

[6] La tendencia es la de no proteger extraños al contrato. Sin embargo, si se demuestra que la compañía que expidió el seguro de título permite que el dueño de la propiedad y el acreedor hipotecario negocien un contrato a sabiendas de la existencia de un defecto en el título y lo oculta, entonces sí le es responsable la compañía al tercero. En *Dixon v. Shirley*, 558 S.W.2d 112, 117 (1977), se dijo:

dante controvertido este aspecto, procede la desestimación del pleito en contra de Pioneer, pues " 'no existe una legítima disputa de hecho a ser dirimida, ... sólo resta aplicar el derecho' ...". *Corp. Presiding Bishop CJC of LDS v. Purcell,* supra, pág. 720.

En el presente caso, el incumplimiento del contrato por parte de Advisors al no cancelar las hipotecas originales acarreó serias consecuencias a los demandantes. Esto, sin embargo, lamentablemente no puede tener el efecto de ampliar la cubierta de una póliza.

En virtud de lo antes expuesto, *se dictará sentencia mediante la cual se confirme la emitida por el Tribunal Superior, Sala de San Juan, el 8 de octubre de 1986 y se devuelve el caso a instancia para que continúen los procedimientos de forma compatible con esta opinión.*

El Juez Asociado Señor Rebollo López concurre sin opinión escrita.

---

"A title company cannot close its eyes to known irregularities or discrepancies between its title policy and the order for the tittle policy (which in this case was a real estate contract). The title company cannot intentionally or negligently permit parties to a contract to close a real estate transaction at its place of business, at its invitation, knowing all along that the contract for sale called for different property than that set forth in its *policy which it issued without full disclosure.* The title company invited the parties to close the transaction at its office. Its agents assured the Dixons that the instrument prepared and the title of insurance covered the subject contract. *The entire problem of the Dixons' damages would have been avoided by the title company speaking at a time when its duty to speak was clear."* (Énfasis suplido.)